**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SIERRA CLUB
2101 Webster Street, Suite 1300,
Oakland, CA 94612

SOUTHERN BORDER COMMUNITIES
COALITION
c/o Alliance San Diego
4443 30th Street, Suite 100
San Diego, CA 92116

Plaintiffs,

v.

KIRSTJEN M. NIELSEN, in her official
capacity as Secretary of the U.S. Department
of Homeland Security,
245 Murray Lane S.W.
Washington, D.C. 20528; and

U.S. DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane S.W.
Washington, D.C. 20528,

Defendants.

Case No. _____

Complaint

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

## I.    INTRODUCTION

1.      Days after taking office, President Donald Trump issued an executive order

directing the U.S. Department of Homeland Security ("DHS," or the "Department") to "take all

appropriate steps to immediately plan, design, and construct a physical wall along the southern

border,"[1] a directive that reflected his consistent refrain that building a 1,900-mile border wall from the Pacific Ocean to the Gulf of Mexico would be a cornerstone of his presidency. Both before and after issuing that executive order, the President made a variety of statements indicating an intent to use the border wall as a tool for stoking racial animus towards Latino immigrants, citizens, and residents for political purposes.

2.      Subsequent to the President's signing of the January 25, 2017 executive order, the DHS Secretary published in the Federal Register five "notices of determination" purporting to "waive" the application of dozens of laws, regulations and legal requirements designed to protect the environment, public safety, and historic and cultural resources under the authority of Section 102(c)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note).

3.      This case challenges the DHS Secretary's two most recent waivers, issued in October 2018, which fast-track construction of approximately 24.6 miles of border infrastructure in southern Texas in Cameron and Hidalgo Counties, areas rich with biodiversity and home to numerous communities and major population centers.

4.      On October 10, 2018, DHS Secretary Kirstjen M. Nielsen signed the first of the two most recent waivers under Section 102(c) of IIRIRA. Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended, 83 Fed. Reg. 50,949 (Oct. 10, 2018) (hereinafter, "Cameron County Waiver"). The waiver claims to authorize the Department and its components, including U.S. Customs and Border Protection

---

[1] White House, Office of Press Sec., Exec. Order No. 13767: Border Security and Immigration Enforcement Improvements, Jan. 25, 2017, *available at* https://www.whitehouse.gov/the-press-office/2017/01/25/executive-order-border-security-and-immigration-enforcement-improvements [hereinafter, "Border Fence Executive Order" or "Executive Order"], at §4(a).

("CBP") and U.S. Border Patrol ("Border Patrol"), to proceed with constructing approximately 6.6 linear miles of border infrastructure in Cameron County, Texas, while forgoing compliance with legal protections that Congress and states have established for, *inter alia*, endangered species, migratory birds, water pollution, historic preservation, safe drinking water, noise pollution, hazardous waste disposal, coastal zones, public lands, outdoor recreation, religious freedom and practice, and administrative procedures. *See id.*

5.      On October 11, 2018, Secretary Nielsen signed the second waiver to expedite construction of approximately 18 miles of border wall infrastructure in Hidalgo County, Texas, while forgoing compliance with the same carefully designed legal protections. Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended, 83 Fed. Reg. 51,472 (Oct. 11, 2018) (hereinafter, "Hidalgo County Waiver").

6.      Both waivers expedite the construction of border infrastructure (including roads, physical barriers, staging areas, ground clearing and lighting) within the Border Patrol's Rio Grande Valley Sector, located in southeast Texas.

7.      The Secretary's October 2018 waivers are *ultra vires* agency actions, made outside the scope of authority granted by Section 102(c) of IIRIRA, as amended. The statute does not authorize the continued, unlimited application of Section 102(c) waivers to the construction of physical barriers and roads beyond those specified by Congress when enacting IIRIRA. Rather, the Secretary's authority to issue waivers for the construction of border infrastructure expired a decade ago, in 2008.  Further, the Secretary has no authority to issue the waivers until the consultation requirements of IIRIRA Section 102(b) have been adequately satisfied, which they have not been in this instance.

8.      The Secretary's failure to comply with the consultation requirements of Section 102(b) are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2).

9.      The October 10 and 11 waivers violate the equal protection component of the Fifth Amendment of the U.S. Constitution, because they are motivated not by necessity but by an intent to stoke racial animus towards Latino immigrants, citizens, and legal residents.

10.     The Secretary's waivers, and the authority to waive all laws provided by IIRIRA, as amended by the REAL ID Act of 2005, violate other provisions and principles of the U.S. Constitution, including separation of powers (Articles I, II, and III), the Presentment Clause (Article I, Section 7, clauses 2 and 3), judicial power of the federal courts (Article III, Section 1), and the nondelegation doctrine embodied in Article I, Section I.

11.     Plaintiffs therefore seek a declaration that the waivers and the statutory provision authorizing such waivers are unconstitutional and that the waivers exceed the Secretary's authority under the IIRIRA as amended by the REAL ID Act.  Plaintiffs also seek an injunction barring the Department or any of its components from constructing any border infrastructure in Cameron and Hidalgo Counties absent full adherence to all applicable laws, regulations, and other legal mandates.

## II.      JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1346(a)(2) (civil action against the United States), and 5 U.S.C. §§ 701-706.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e), because defendants are officers, employees, or agencies of the United States and a substantial part of the

events or omissions giving rise to the claims have occurred in this district due to decisions made by Defendants, and/or failure(s) to act by the Defendants.

### III.    PARTIES

14.    Plaintiff SIERRA CLUB is incorporated in the State of California as a nonprofit public benefit corporation with headquarters in Oakland, California. Sierra Club is a national organization with 67 chapters and more than 782,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's Lone Star Chapter, which covers the State of Texas, has more than 26,100 members, more than 440 of whom live in the Lower Rio Grande Valley. Sierra Club's advocacy at the southern border includes educating and mobilizing the public on issues of habitat destruction, divided local communities, land use and myriad other human and environmental impacts associated with border wall construction activities. Sierra Club has been actively involved in protecting habitat along the southern border for many years, including work to protect the Santa Ana National Wildlife Refuge, which is located along the northern side of the Rio Grande River in the Rio Grande Valley in Hidalgo County. Sierra Club is committed to the protection of threatened and endangered species that inhabit the areas surrounding the proposed border walls, as well as their habitat, including the Lower Rio Grande Valley National Wildlife Refuge, Bentsen-Rio Grande Valley State Park, and the National Butterfly Center (privately owned).

15.    Sierra Club brings this action on its own behalf and on behalf of its members. Sierra Club members live near and frequently visit the parks, refuges, and other public lands along Texas-Mexico border in Cameron and Hidalgo Counties  — including the Lower Rio

Grande Valley National Wildlife Refuge and Bentsen-Rio Grande Valley State Park — for hiking, bird watching, photography and other professional, scientific, recreational and aesthetic uses. Sierra Club's members obtain recreational, professional, scientific, educational, and aesthetic benefits from their activities in these areas. Sierra Club and its members in the Lower Rio Grande Valley have been and continue to be injured by the construction of a border wall and related infrastructure that has already occurred in the area and that has been approved in the two waivers. Such injuries are particularly significant because the U.S. Department of Homeland Security is proceeding with border work without first complying with decades-old environmental and public safety laws and regulations that were enacted for the very purpose of protecting the places, species, and values Sierra Club members work to protect. The requested relief will redress these injuries.

16.     Plaintiff SOUTHERN BORDER COMMUNITIES COALITION (SBCC) is a program of Alliance San Diego, a nonprofit public benefit corporation with headquarters in California. The Southern Border Communities Coalition brings together 60 organizations from San Diego, California to Brownsville, Texas, to advocate on behalf of the border communities that have borne the brunt of increased militarization and construction at the border by U.S. Customs and Border Protection, an agency within the U.S. Department of Homeland Security. SBCC has an organizational interest in preventing adverse impacts from those policies on businesses, residents' human rights, the environment, and international relations. SBCC unites organizations and community leaders to ensure that border enforcement policies and practices, including border construction activities, are accountable and fair, respect human dignity and human rights, and prevent the loss of life in the region; promote policies and solutions that

improve the quality of life in border communities; and support rational and humane immigration reform policies affecting the border region.

17.     SBCC brings this action on its own behalf and on behalf of its members. SBCC's members live in and around the impacted borderlands, including Brownsville, McAllen, and surrounding areas. Members recreate in and derive other benefits from the impacted parks. The border infrastructure will restrict their access to these and other public spaces, degrading their quality of life. The border infrastructure will negatively impact ecotourism, harming the economic wellbeing of the towns and communities where SBCC members live. The border infrastructure will divide and fragment towns and communities in which SBCC members live, impairing the integrity and character of communities, heightening racial division, and further undermining quality of life. Such impacts also will undermine the binational character of the border communities by restricting movement and increasing members' fears about traveling back and forth across the border, as many local community members frequently do. Border wall infrastructure also exposes members to heightened risk from flooding. DHS's failure to consider alternatives to the border infrastructure that would minimize impacts to the environment, parks, historical and religious resources, communities, and quality of life directly harms members economically, culturally, recreationally, aesthetically, and religiously. The requested relief would redress these injuries.

18.     Defendant U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS," or the "Department") is the executive department responsible for, *inter alia*, enforcing and administering laws related to immigration and securing and managing the nation's borders, consistent with applicable legal requirements.

19.     Defendant KIRSTJEN M. NIELSEN ("Secretary"), Secretary of Homeland Security, is sued in her official capacity. Secretary Nielsen, exercised the waiver provision of Section 102(c) of IIRIRA in her October 10 and 11, 2018 determinations. Secretary Nielsen is responsible for ensuring that DHS actions comply with applicable laws.

20.     Defendant UNITED STATES OF AMERICA is responsible for enacting and enforcing laws that are consistent with the Constitution of the United States.

## IV.     STATUTORY BACKGROUND

21.     Section 102(a) the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 306, as amended by the Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638, as amended by the Department of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V, § 564(a), 121 Stat. 2090-91 (Dec. 26, 2007), directs the Secretary to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." 8 U.S.C. § 1103 note (hereinafter "Section 102" or "IIRIRA § 102").

22.     Section 102(b), as amended by the REAL ID Act of 2005, sets parameters around Section 102(a).  The Secretary "shall construct reinforced fencing along not less than 700 miles of the southwest border . . . to gain operational control of the southwest border." IIRIRA § 102(b)(1)(A). In "[p]riority areas," the Secretary shall identify and construct 370 miles (or other mileage determined by the Secretary) of fencing, *i.e.*, in those areas where "fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States." *Id.* § 102(b)(1)(B).

23.     Section 102(b) sets an explicit time limit on the Secretary's authority to identify

priority areas and to construct fencing within those areas by December 31, 2008.  Specifically,

the Secretary's authority to identify priority areas "shall expire on December 31, 2008," and the

Secretary shall "complete construction of reinforced fencing along those miles" "not later than

December 31, 2008."  *Id.* § 102(b)(1)(B)(i) & (ii).

24.      Before commencing with *any* construction or related activities, Section 102(b)

requires the Secretary to first "consult with the Secretary of the Interior, the Secretary of

Agriculture, States, local governments, Indian tribes, and property owners . . . to minimize the

impact on the environment, culture, commerce, and quality of life for the communities and

residents located near the sites at which such fencing is to be constructed." *Id.* § 102(b)(1)(C)(i).

25.     Section 102(c), as amended by the REAL ID Act of 2005, authorizes the

Secretary "to waive all legal requirements such Secretary, in such Secretary's sole discretion,

determines necessary to ensure expeditious construction of the barriers and roads under this

section." *Id.* § 102(c)(1) (emphasis added).

26.     Section 102(c) also restricts judicial review. District courts of the United States

have "exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or

any decision made, by the Secretary of Homeland Security pursuant to paragraph (1)," the

provision that authorizes the Secretary to waive legal requirements in defined circumstances.

Any such cause of action or claim may only allege a violation of the U.S. Constitution and must

be filed within sixty days of the Secretary's decision. *Id.* § 102(c)(2)(A), (B).  An appeal of the

ensuing district court decision may only "be reviewed only upon petition for a writ of certiorari

to the Supreme Court of the United States." *Id.* § 102(c)(2)(C). The statute thus purports to

eliminate intermediate appeal review of district court decisions that fall within the scope of this restriction on judicial review.

## V.      FACTUAL BACKGROUND

**A.      DHS Secretary's Use of Waiver Authority Under IIRIRA**

27.      Prior to the current Administration, the DHS Secretary invoked the Section 102(c) waiver authority five times to expedite the construction of border infrastructure: (1) in September 2005 to expedite construction in the Border Patrol's San Diego Sector,[2] (2) in January 2007 to expedite construction in southwestern Arizona,[3] (3) in October 2007 to expedite construction in southeastern Arizona,[4] (4) in April 2008 to expedite construction in Hidalgo County, Texas,[5] and (5) in April 2008 to expedite construction in California, Arizona, New Mexico, and Texas.[6] All five waivers were published in the Federal Register before December 31, 2008, when the Secretary's authority to expedite construction expired. *See* IIRIRA §§ 102(b)(1), (c)(1).  Prior

---

[2] Dep't of Homeland Sec., "Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005," 70 *Federal Register* 55622-02, September 22, 2005.

[3] Dep't of Homeland Sec., "Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005 and as Amended by the Secure Fence Act of 2006," 72 *Federal Register* 2535-01, January 19, 2007.

[4] Dep't of Homeland Sec., "Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005 and as Amended by the Secure Fence Act of 2006," 72 *Federal Register* 60870-01, October 26, 2007.

[5] Dep't of Homeland Sec., "Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended," 73 *Federal Register* 18294 (April 3, 2008), *republished with additional document in* 73 *Federal Register* 19077 (April 8, 2008).

[6] Dep't of Homeland Sec., "Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended," 73 *Federal Register* 18293 (April 3, 2008), *republished with additional document in* 73 *Federal Register* 19078 (April 8, 2008).

Administrations did not invoke Section 102(c) waiver authority subsequent to December 31, 2008.

28.     The current Administration has invoked the Section 102(c) waiver authority five times:  two waivers for border wall infrastructure in California, a third for border wall infrastructure in New Mexico, and two for border wall infrastructure in the Lower Rio Grande Valley, the two waivers at issue in this case.

29.     None of the waivers issued by the current Administration have been for projects that fall within the scope of Section 102(b) of the IIRIRA.

**B.      October 2018 Waivers for Rio Grande Valley Sector, Texas**

30.     The DHS Secretary issued the two waivers at issue in this case on October 10 and 11, 2018.  On October 10, the Secretary invoked Section 102(c) to expedite construction of infrastructure along approximately 6.6 linear miles near the U.S.-Mexico border in Cameron County, Texas. 83 Fed. Reg. at 50,951. The next day, the Secretary invoked the same authority to expedite construction of infrastructure totaling approximately 18 linear miles in six different areas of Hidalgo County, Texas. 83 Fed. Reg. at 51,472.

31.     Each waiver claims to provide the Department and its components broad authority to "construct physical barriers and roads in the vicinity of the border of the United States" and to forgo compliance with twenty-eight laws "in their entirety" including "all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of" the enumerated laws. 83 Fed. Reg. at 50,951; 83 Fed. Reg. at 51,472.

32.     The laws, regulations, and other legal requirements the DHS Secretary sought to waive on October 10 and 11 were carefully designed to protect the environment, public safety,

and historic and cultural resources, among other essential values.  Specifically, the Secretary claimed the power to waive the application of:

    i.    National Environmental Policy Act (Pub. L. 91-190, 83 Stat. 852 (Jan. 1, 1970) (42 U.S.C. 4321 *et seq.*));

    ii.    Endangered Species Act (Pub. L. 93-205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. 1531 *et seq.*));

    iii.    Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C. 1251 *et seq.*));

    iv.    National Historic Preservation Act (Pub. L. 89-665, 80 Stat. 915 (Oct. 15, 1966), as amended, repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 470 *et seq.,* now codified at 54 U.S.C. 100101 note and 54 U.S.C. 300101 *et seq.*));

    v.    Safe Drinking Water Act (42 U.S.C. 300f *et seq.*);

    vi.    Clean Air Act (42 U.S.C. 7401 *et seq.*);

    vii.    Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 *et seq.*);

    viii.    Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601 *et seq.*);

    ix.    Migratory Bird Treaty Act (16 U.S.C. 703 *et seq.*);

    x.    Migratory Bird Conservation Act (16 U.S.C. 715 *et seq.*);

    xi.    Archeological Resources Protection Act (Pub. L. 96-95 (16 U.S.C. 470aa *et seq.*));

    xii.    Paleontological Resources Preservation Act (16 U.S.C. 470aaa *et seq.*);

xiii.     Federal Cave Resources Protection Act of 1988 (16 U.S.C. 4301 *et seq.*);

xiv.     Noise Control Act (42 U.S.C. 4901 *et seq.*);

xv.      Archaeological and Historic Preservation Act (Pub. L. 86-523, as amended,

repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16

U.S.C. 469 *et seq.,* now codified at 54 U.S.C. 312502 *et seq.*));

xvi.     Antiquities Act (formerly codified at 16 U.S.C. 431 *et seq.,* now codified 54

U.S.C. 320301 *et seq.*);

xvii.    Historic Sites, Buildings, and Antiquities Act (formerly codified at 16 U.S.C.

461 *et seq.,* now codified at 54 U.S.C. 3201-320303 & 320101-320106);

xviii.   Farmland Protection Policy Act (7 U.S.C. 4201 *et seq.*);

xix.     Coastal Zone Management Act (Pub. L. 92-583 (16 U.S.C. 1451, *et seq.*));

xx.      Federal Land Policy and Management Act (Pub. L. 94-579 (43 U.S.C. 1701 *et*

*seq.*));

xxi.     National Wildlife Refuge System Administration Act (Pub. L. 89-669, 16 U.S.C.

668dd-668ee);

xxii.    National Fish and Wildlife Act of 1956 (Pub. L. 84-1024 (16 U.S.C. 742a, *et*

*seq.*));

xxiii.   Fish and Wildlife Coordination Act (Pub. L. 73-121 (16 U.S.C. 661 *et seq.*));

xxiv.    River and Harbors Act of 1899 (33 U.S.C. 403));

xxv.     Eagle Protection Act (16 U.S.C. 668 *et seq.*);

xxvi.    Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 *et*

*seq.*);

xxvii.   American Indian Religious Freedom Act (42 U.S.C. 1996); and

xxviii.    Administrative Procedure Act (5 U.S.C. 551 *et seq.*).

83 Fed. Reg. at 50,951; 83 Fed. Reg. at 51,472.

33.    The October 2018 waivers also purport to give the Department and its components broad authority to engage in numerous activities in the project areas including, but not limited to, "accessing the project area, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors." 83 Fed. Reg. at 50,951; 83 Fed. Reg. at 51,472.

34.    The border wall construction would include vertical concrete river levees, topped by 18-foot tall bollard fencing, as well as a 150-foot-wide cleared "enforcement zone" that would feature 24-7 stadium-style high-intensity lights.

35.    The Trump Administration's expansive interpretation of IIRIRA Section 102 would give the DHS Secretary sweeping power to proceed with border wall construction irrespective of the grave harm that such activities likely will cause to communities, the environment, and historic and cultural resources, and irrespective of longstanding principles of public consultation and participation.

## C.    Apparent Motivation for the October 2018 Waivers

36.    In the months before and after the DHS Secretary issued the waivers, President Trump made numerous statements indicating an animus toward Latino immigrants, both those intending to immigrate to the United States and those already settled here.  These and other statements strongly indicate that the waivers were motivated by an unconstitutional purpose: an intent to stoke racial animus for political purposes, rather than an urgent need to expedite construction of infrastructure along the U.S.-Mexico border.

37.     For example, the President spoke on January 11, 2018, about "these people from shithole countries" coming to the United States, referring to people from Central America and Africa. The next month, he stated that certain immigrants "turn out to be horrendous. . . . They're not giving us their best people, folks."  On May 16, 2018, he stated that "[w]e have people coming into the country, or trying to come in. . . . . You wouldn't believe how bad these people are. These aren't people, these are animals. . . ."

38.     President Trump's racially charged statements that degrade and dehumanize people have explicitly targeted immigrants from Mexico and Central America, including not just those intending to migrate here, but also those who have already settled in the United States and are citizens or residents.  In June 2015, as a presidential candidate, President Trump stated, "When Mexico sends its people, they're not sending their best…. They're sending people that have a lot of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists."

39.     About two weeks after the waivers were issued, President Trump, on October 29, 2018, called a caravan of Central American asylum seekers heading toward the U.S.-Mexico border an "invasion" containing "Many Gang Members and some very bad people" and stated that "our Military is waiting for you!"  On October 31, the President ran an ad comparing the caravan of asylum seekers to Luis Bracamontes, an undocumented immigrant in the United States who was convicted of murdering two U.S. law enforcement officials. Later, in the days leading up to the midterm elections, the President sought deployment of active-duty troops to the U.S.-Mexico border.

40.     On November 25, 2018, the President tweeted:  "Mexico should move the flag waving Migrants, many of whom are stone cold criminals, back to their countries. Do it by plane,

do it by bus, do it anyway you want, but they are NOT coming into the U.S.A. We will close the Border permanently if need be. Congress, fund the WALL!"

41.     The Trump Administration has also targeted U.S. citizens and legal residents who identify as Latinos or as Hispanics and who live near the U.S.-Mexico border.  For example, the Trump Administration accused Hispanic-Americans along the border of having fraudulent birth certificates since they were born to midwives, and in some cases his administration jailed passport applicants in immigration detention centers and launched deportation proceedings against them — even when the passport applicants had official U.S. birth certificates.

42.     The President has also made statements reflecting racial animus towards a member of the judicial branch based solely on his background. President Trump accused a federal judge, who was born in Indiana, as being biased simply because the judge was "Mexican."  In May 2016, Trump stated:  "I have a judge who is a hater of Donald Trump, a hater. He's a hater."  In a June 2016 interview, Trump stated: "Let me just tell you, I've had horrible rulings, I've been treated very unfairly by this judge. Now, this judge is of Mexican heritage . . . he's a member of a society, where – you know, very pro-Mexico." Earlier, in March 2015, Trump remarked that "I hope the Mexican judge is more honest than the Mexican businessmen who used the court system to avoid paying me the money they owe me."

43.     In a July 2015 Tweet about Jeb Bush's Mexican-American wife, Trump stated "#JebBush has to like Mexican Illegals because of his wife."

44.     Trump's repeated statements denigrating Latinos and specifically Mexicans demonstrates an animus that has coincided with his public calls for the wall, such as in an April 16, 2015 tweet in which Trump attempted to justify his wall by implying that Mexican immigrants were criminals and the Mexican people would be punished if the wall was not built.

He stated, "Our border is being breached daily by criminals. We must build a wall & deduct costs from Mexican foreign aid."

45.     While President Trump did not issue the Waivers himself to build the wall, the President was personally and directly involved in the decision because the DHS Secretary issued waivers in response to the President's January 25, 2017 executive order.

**D.      Threat to Lower Rio Grande Valley Communities and Environment**

46.     The Lower Rio Grande Valley, located at the southern tip of Texas where the Rio Grande enters the Gulf of Mexico, is a delta that periodically experiences severe rains and flooding. Floodwaters can back up against walls and levees and can flood communities, recreational areas, and protected wildlife areas. Flooding also can trap recreationalists, landowners, migrants, wildlife, and domestic animals between border walls or levee walls, leaving them with few options to escape rapidly rising waters.

47.     The October 2018 waivers, which claim to allow the Department and its components to ignore critical legal protections such as (among others) the National Environmental Policy Act, Endangered Species Act, the Clean Water Act, the National Historic Preservation Act, and National Wildlife Refuge System Administration Act, threaten to significantly exacerbate flood risks and to divide communities, fragment and damage critical wildlife areas, jeopardize the continued existence of threatened and endangered species, harm economic, social, and recreational interests, and damage irreplaceable historic landmarks.

**1.      Harm to Communities**

48.     The October 10 and 11 waivers for expedited construction of border infrastructure in Cameron and Hidalgo Counties threaten people, historic and cultural resources, and recreational areas.  The Cameron County Waiver, for example, would fast-track construction of

infrastructure within, or adjacent to, a neighborhood in Brownsville, Texas, a city of 183,299 people. The planned infrastructure in San Benito, Texas would be within 4,000 feet of El Ranchito Head Start Center, an early childhood learning center, and St. Ignatius Religious Ed, a private school.  Other communities directly affected by the waiver include Santa Maria (population 733), Los Indios (population 1,062), La Paloma (population 3,157), Encantada-Ranchito El Calaboz (population 2,100), Villa Pancho (population 690), and South Point (population 1,007). The proposed infrastructure would cut through or be adjacent to these communities.

49.     The October 11 Hidalgo County Waiver similarly proposes to expedite construction of border infrastructure through numerous communities, including major population centers such as Mission (population 84,424), home to the National Butterfly Center, and McAllen (population 142,696), a city located immediately east of Mission. The proposed border structures also would divide Madero, a town located just south of Mission; to cut through La Lomita Mission and Historical Park, a site that includes a historic chapel built in the late 1800s; and cross the property of Juan Diego Academy, a small Catholic school in Mission. Other communities affected by the Hidalgo County Waiver include, among others, Pharr (population 79,487), San Juan (population 36,981), Progreso (population 5,938), Palmview South (population 5,221), and Scissors (population 3,427). The proposed expedited infrastructure projects would cut through or be immediately adjacent to these communities.

50.     As a result of the October 2018 waivers, these communities and others in the path of the waivers would be more vulnerable to flooding, divided by border infrastructure, and suffer irreparable damage to cultural, historic, and recreational sites. The infrastructure would segment communities, as well as restrict their residents' ease of movement and their (already limited)

access to public lands, resulting in harm to quality of life. Further, it would harm the identity and integrity of surrounding communities by damaging the binational relations on which those communities depend for their economic wellbeing.

51.     The proposed infrastructure would also harm local economies that are dependent on ecotourism at the wildlife refuges and parks described below. For example, a 2011 Texas A&M study estimated that the ecotourism industry provides $463 million to the local Rio Grande Valley economy. The continued vitality of the impacted parks and wildlife refuges is thus critical to the economic wellbeing of the Rio Grande Valley. The resulting economic impacts of those parks' closure or degradation would be borne in large part by two of the lowest income communities in the country, McAllen and Brownsville.

52.     Both the October 10 and 11 waivers also will disproportionately impact low-income Latino colonias and border communities in the Rio Grande Valley. These communities will bear a disproportionate economic burden from the fragmentation of their communities and from the harm the waivers cause to important economic resources, including the parks that are a cornerstone of the local economies.

53.     Further, the expedited border militarization occurring as a result of the waivers, and the failure of DHS to consider ways to minimize impacts of the expedited border construction's impact on quality of life, will disproportionately affect Latino residents in these communities by increasing racial hostility directed at these residents by community members who are emboldened by President Trump's own statements. Latino residents' freedom of movement will also be discriminatorily restricted as a result of the waivers; legal Latino residents and citizens fear increased interaction with border patrol in public spaces, and will thus visit remaining public lands less frequently. For example, recent news articles have pointed out that

South Texas U.S. citizens are increasingly being swept up by immigration enforcement agencies. *See, e.g.,* Kevin Sieff, *U.S. is Denying Passports to Americans Along the Border, Throwing Their Citizenship Into Question*, Washington Post, Sep. 13, 2018, *available at*

https://www.washingtonpost.com/world/

the_americas/us-is-denying-passports-to-americans-along-the-border-throwing-their-citizenship-

into-question/2018/08/29/1d630e84-a0da-11e8-a3dd-2a1991f075d5_

story.html?utm_term=.3ed24b45141a.

54.     Latino residents also will disproportionately bear the environmental impacts resulting from the waivers, including increased flood risk and decreased access to public lands essential to health and quality of life.

## 2.     Harm to Unique and Precious Ecosystems

55.     The Lower Rio Grande Valley is characterized by a unique mix of coastal, temperate, desert, and subtropical ecosystems that provide habitat for thousands of species, including more than 1,200 plant species, over 520 bird species, and hundreds of butterfly species. By ignoring compliance with numerous environmental laws, including the National Environmental Policy Act, Endangered Species Act, and National Wildlife Refuge System Administration Act, the Cameron County and Hidalgo County waivers would irreparably harm these rare and valuable species and their habitat.

56.     For example, both waivers would construct border wall infrastructure within the Lower Rio Grande Valley National Wildlife Refuge ("Refuge"), which was established in 1979 to protect biodiversity and native habitat. Among other critical functions, the Refuge provides a "wildlife corridor" that follows the Rio Grande along 275 river miles, connecting isolated tracts of land managed by private landowners, nonprofit organizations, the State of Texas, and two

other national wildlife refuges, Laguna Atascosa and Santa Ana. This critical wildlife corridor –
which the border infrastructure would bisect, fragment and irreparably harm – is crucial to the
preservation of the Lower Rio Grande Valley's rich biodiversity.

57.     The part of the Refuge within Cameron and Hidalgo Counties is home to at least
thirty-five species of migratory birds and more than fifteen federally threatened and endangered
species, including the endangered jaguarondi (*herpailurus yagouaroundi cacomitli*), an elusive
cat, and endangered ocelot (*leopardus pardalis*), a cat that now numbers fewer than fifty in the
United States, endangered West Indian manatee (*trichechus manatus*), endangered Kemp's ridley
sea turtle (*lepidochelys kempii*),  endangered star cactus (*astrophytum asterias*), threatened
piping plover (*charadrius melodus*), and endangered northern aplomado falcon (*falco femoralis
septentrionalis*). By completely disregarding numerous environmental statutes, the waivers
threaten to cause considerable harm to these and other vulnerable species, jeopardizing their very
existence.

58.     Bentsen-Rio Grande Valley State Park also would suffer significant and
irreparable damage as a result of the Hidalgo County Waiver, because the wall construction
would completely bisect the park. A haven for birds, the state park is one of the larger remaining
tracts of Rio Grande floodplain forest in the region and includes part of the World Birding Center
– a network of birding sites that provides prime opportunities to observe an abundance of
tropical bird species found nowhere else in the United States and that offers educational
opportunities for high school and college students. Thirty species of birds are found in the Rio
Grande Valley and nowhere else in the United States. The border infrastructure would cut off the
Park's headquarters and visitor's center from the rest of the Park. Texas Parks and Wildlife has
publicly stated that the Park may have to close if the border wall is constructed along its current

path. With the 150-foot "enforcement zone" around roughly 9,000 feet of wall expected to run through the park, approximately 31 acres of sensitive habitat would be destroyed, and the entirety of the remaining park would be behind the "no-man's land" on the other side of the wall.

59.     Based on information and belief, U.S. Customs and Border Protection (CBP) did not confirm to Texas Parks and Wildlife that Bentsen State Park would be included in its construction of the wall until two weeks after awarding a $145-million construction contract. Months prior, Texas Parks and Wildlife presented several proposed alternatives for enhancing border security through the park, but CBP did not respond.

60.     The National Butterfly Center, in Mission, Texas (Hidalgo County), is a 100-acre wildlife center and botanical garden for native species that provides a migratory flyway for birds, butterflies, and a host of other wildlife. More than 200 species of butterflies have been observed at the Center, including a number of sightings of butterflies never seen before in the United States.  Among other resources, the conservation and recreational area includes hiking trails, observation areas, and educational exhibits. The planned border infrastructure fast tracked by the Hidalgo County Waiver would divide this popular area and threatens to eradicate native habitat, cause severe flooding, reduce the amount of viable range land, and jeopardize the Center's ability to continue operation.

61.     The Santa Ana National Wildlife Refuge in Hidalgo County is positioned along an east-west and north-south juncture of two major migratory bird routes. Known as the "jewel of the National Wildlife Refuge System," the 2,088-acre parcel offers visitors an opportunity to view birds, butterflies, and other species not found anywhere else in the United States beyond deep South Texas.

62.     The infrastructure fast tracked by the Cameron County waiver would be within 200 feet of the Southmost Preserve, home to one of the only two remaining large stands of native Mexican sabal palm/Tamaulipan thornscrub stands in the United States. The preserve provides important habitat for rare, threatened, and endangered species including the southern yellow bat, Texas tortoise, Coue's rice rat, black-spotted newt, and speckled racer.

63.     Through the operation of the October 2018 waivers, the Department and its components seek to ignore significant harm to valuable environmental and recreational resources, including irreparable damage to native habitat, loss of federally endangered and threatened species, and fragmentation of critical migration corridors.

64.     The waivers would authorize construction of border barriers that would directly destroy habitat, block migration and cross-border movement of species necessary to their survival, degrade genetic pools, and exacerbate flooding, causing wildlife to become trapped and drown.

65.     Construction of the border infrastructure is imminent. Based on information and belief, CBP has already begun conducting land surveys and has initiated several eminent domain proceedings in areas described in the waivers.

## VI.     FIRST CLAIM FOR RELIEF

### (*Ultra Vires* Agency Action under Section 102(c) of IIRIRA)

66.     Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

67.     Section 102(a) of IIRIRA, as amended, authorizes the Secretary to "take such actions as may be necessary to install additional physical barriers and roads … in the vicinity of

the United States border to deter illegal crossings in areas of high illegal entry into the United States."

68.     Section 102(b) of IIRIRA directs the Secretary to "construct reinforced fencing … where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border" to the extent necessary "in carrying out subsection (a)."

69.     Section 102(c)(1) of IIRIRA authorizes the Secretary to "waive all legal requirements such Secretary … determines necessary to ensure expeditious construction of the barriers and roads under this section." (Emphasis added.)

70.     As enacted in 1996, Section 102(b) of IIRIRA applied only to the border area "[n]ear San Diego, California," being limited to "construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences." Pub. L. No. 104-208, Div. C, § 102(b) 110 Stat. 3554.

71.     Seventeen months after adding the waiver provision to Section 102(c) of IIRIRA in the REAL ID Act of 2005, the Secure Fence Act of 2006 amended Section 102(b) of IIRIRA by striking "Near San Diego, California," and directing the Secretary to construct at "least 2 layers of reinforced fencing, the installation of additional physical barriers, roads, lighting, cameras, and sensors" in five specific areas totaling approximately 850 miles. Pub. L. No. 109-367 § 3, 120 Stat 2639.

72.     Fourteen months after passing the Secure Fence Act of 2006, Section 102(b) of IIRIRA was again amended in the DHS Appropriations Act, 2008, by removing previous specified areas and requiring the Secretary to "construct reinforced fencing along not less than

700 miles of the southwest border where fencing would be most practical and effective." Pub. L.

No. 110-161, Div. E, Title V, § 564(a), 121 Stat. 2090 (2007).

73.     In addition, the 2008 Appropriations Act required the Secretary to "identify" and

"construct" "370 miles, or other mileage determined by the Secretary, whose authority to

determine other mileage shall expire on December 31, 2008, along the southwest border where

fencing would be most practical and effective." *Id.*

74.     Section 102(c) of IIRIRA's waiver provision has remained unchanged by

Congress since amended by the REAL ID Act of 2005.

75.      There is no indication that Section 102(c) of IIRIRA applies to the 2006 and

2008 amendments to Section 102(b).

76.     Assuming, *arguendo*, the enlarged barrier border authorization in the 2008

IIRIRA amendments were eligible for waivers under Section 102(c), DHS has completed those

specified mandates, and the Secretary's authority to identify and construct other mileage expired

on December 31, 2008.

77.     Further, the purported waivers are not necessary to ensure the "expeditious"

construction of the border wall project. The Section 102(c) waiver authority has not been further

amended by Congress in the twelve years since its 2005 consideration and enactment, despite the

extensive amendments to IIRIRA section 102(b) by the 2006 Secure Fence Act and 2008

Consolidated Appropriations Act. The plain meaning of broadly allowing the waiver of any laws

determined by the DHS Secretary as necessary to ensure the "expeditious construction" under

Section 102(c) of IIRIRA was to provide the DHS Secretary with the authority to waive laws in

order to build border barriers as soon as possible after the enactment of the law (*i.e.*, the REAL

ID Act of 2005).

78.     This interpretation is further supported by Congress's subsequent establishment of specific deadlines in its amendments to IIRIRA section 102(b) under the 2006 Secure Fence Act and 2008 Consolidated Appropriations Act; most notably, its direction that at least 370 miles of border barriers be constructed by December 31, 2008, and its explicit termination of the Secretary's authority to designate "priority areas" for such construction by that same date. IIRIRA § 102(b)(2)(A)-(B).

79.     Because December 31, 2008 has long since passed, the border wall projects at issue in this complaint do not fall within the scope of the IIRIRA section 102(c) waiver authority.  The Cameron County and Hidalgo County waivers therefore are unlawful *ultra vires* acts subject to review by this Court, because the waivers authorize activities that are beyond the scope of Section 102(c) of IRRIRA's waiver provision.  For the same reason, the restrictions on judicial review and appellate review under that subsection are inapplicable to that determination.

## VII.     SECOND CLAIM FOR RELIEF

### (Violation of Section 102(b)(1)(C) and the A.P.A.)

80.     Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

81.     Subparagraph 102(b)(1)(C) of IRRIRA requires the Secretary, prior to taking actions to carry out IIRIRA, to

> consult with the Secretary of the Interior, the Secretary of Agriculture, States,
> local governments, Indian tribes, and property owners in the United States to
> minimize the impact on the environment, culture, commerce, and quality of life
> for the communities and residents located near the sites at which such fencing is

to be constructed.

82.     Paragraph 102(c)(1) of IIRIRA authorizes the Secretary to waive all legal requirements "[n]otwithstanding any other provision of law." (Emphasis added.)

83.     Subsections 102(a) and (b) are not "other provision[s] of law," but part of the same law as the subsection (c) waiver authority. The ability to waive other laws, to the extent that it exists at all, thus does not apply with respect to the consultation requirement.

84.     The restriction on judicial review in subparagraph 102(c)(2)(A) of IIRIRA applies only to "any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph [102(c)](1)." The restriction on judicial review to constitutional claims thus does not apply to the consultation requirement.

85.     The requirements of subsections 102(a) and (b), in fact, are prerequisites to the Secretary using the waiver authority of subsection 102(c).

86.     It is the Plaintiffs' understanding and belief that the Secretary has not consulted with all of the entities required by subparagraph 102(b)(1)(C) prior to issuing either the Cameron County or Hidalgo County waivers. The Secretary opened a "public comment" period that closed on November 6, 2018 – i.e., several weeks *after* the waivers were issued. Moreover, based on information and belief, the Secretary had at that point already begun identifying areas in which it intended to exercise eminent domain, and had already entered into a contract for construction of border wall segments. The Secretary also did not provide information sufficient to allow the public to submit meaningful comments.

87.     Moreover, the waivers do not "minimize the impact on the environment, culture, commerce and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." IIRIRA § 102(b)(2)(C)(i).

26

88.     The Secretary's decisions on the Cameron County or Hidalgo County waivers are therefore arbitrary, capricious, an abuse of discretion, *ultra vires,* or otherwise not in accordance with law, and without observance of procedure required by law. 5 U.S.C. § 706(2). The restrictions on judicial review and appellate review under section 102(c) are inapplicable to that determination.

## VIII.     THIRD CLAIM FOR RELIEF

### (Violation of the U.S. Constitution, Amendment V)
### (Due Process and Equal Protection)

89.     Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

90.     The Due Process Clause of Amendment V of the U.S. Constitution provides that "[n]o personal shall be…deprived of life, liberty, or property, without due process of law." The Clause incorporates an equal protection component, and prohibits racial discrimination by the federal government. *See, e.g.*, *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

91.     The Waivers represent an act with discriminatory intent toward Latino immigrants, citizens, and lawful residents.

92.     The Waivers are motivated by discriminatory animus, and result in a discriminatory effect. *Hayden v. Cty. of Nassau* ("*Hayden I* "), 180 F.3d 42, 48 (2d Cir. 1999).

93.     The Waivers, as directed by the Border Fence Executive Order, are motivated by a racially discriminatory intent or purpose, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment. The Secretary, as directed by the President's Executive Order, issued the waivers at least in part because of an intent to exploit racial animus

towards an identifiable group, namely, Latino immigrants, citizens, and residents, for political purposes.

94.     As discussed in incorporated paragraphs, above, the President's statements and actions prior to and following his Executive Order are indicative of this intent.  The historical background of the Waivers and sequence of events leading up to the waivers indicates invidious purpose, and suggests that the Secretary's proffered rationale of the necessity of expedited border construction is pretextual.

95.     While President Trump did not issue the waivers himself, the President was personally and directly involved in the decision, given that the waivers were issued in response to the President's January 25, 2017 executive order.

96.     The Waivers will have a discriminatory effect because they will disproportionately impact low-income Latino colonias and border communities in the Rio Grande Valley. These communities will bear a disproportionate economic burden from the fragmentation of their communities and of key economic resources as a result of the waivers, including the parks that are a cornerstone of the local economies. Further, the expedited border militarization occurring as a result of the waivers, and the failure of DHS and its components to consider ways to minimize impacts of the expedited border construction's impact on quality of life, will disproportionately affect Latino citizens and residents in these communities. Impacts will include increasing racial hostility towards Latinos, restricting movement, impairing property rights, and impeding access to cherished public lands and recreational areas. Latino residents' and citizens' freedom of movement will also be discriminatorily restricted as a result of the waivers; Latino permanent residents and citizens fear increased interaction with border patrol in public spaces, and will thus visit remaining public lands less frequently.  Latino residents also

will disproportionately bear the environmental impacts resulting from the Waivers, including increased flood risk and decreased access to public lands essential to health and quality of life.

## IX.    FOURTH CLAIM FOR RELIEF

### (Violation of the U.S. Constitution, Art. I, § 7, Cls. 2 and 3)
### (The Presentment Clauses)

97.    Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

98.    Section 102(c)(1) of IIRIRA, as amended, provides the Secretary "authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads" in the vicinity of the United States border.

99.    The Secretary's Hidalgo County and Cameron County waivers, issued pursuant to Section 102(c)(1) of IIRIRA, as amended, abrogate twenty-eight enacted federal statutes and an undetermined number of "federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of" those statutes.

100.    Under Article I, Section 7, Clause 2 of the U.S. Constitution, "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States."

101.    Under Article I, Section 7, Clause 3 of the U.S. Constitution, "Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives."

102.    Section 102(c)(1) of IIRIRA, as interpreted by the Secretary, provides the Secretary *de facto* repeal authority, allowing her to nullify validly enacted statutes without passing both the Senate and House of Representatives and without being presented to the President, including statutes that fall entirely outside the DHS Secretary's lawful scope of authority or the expertise of DHS.

103.    The Secretary's interpretation of Section 102(c)(1) of IIRIRA is unconstitutional as it violates the lawmaking procedures set forth in the Presentment Clauses expressed in Article I, Section 7, Clauses 2 and 3 of the U.S. Constitution.

104.    The Secretary's Cameron County and Hidalgo County Waivers made pursuant to Section 102(c)(1) of IIRIRA violate the lawmaking procedures set forth in the Presentment Clauses expressed in Article I, Section 7, Clauses 2 and 3 of the U.S. Constitution.

## X.    FIFTH CLAIM FOR RELIEF

### (Violation of the U.S. Constitution, Art. I, § 1 and Art. II § 1)
### (Nondelegation Doctrine)

105.    Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as though fully set forth herein.

106.    Article I, Section 1 if the U.S. Constitutions vests "[a]ll legislative Powers herein granted … in a Congress of the United States."

107.    "This text permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (U.S. 2001).

108.    Article II, Section 1 of the Constitution provides: "The executive Power shall be vested in a President of a United States of America."

109.    Section 102(c) of IIRIRA is an unconstitutional delegation of legislative power to an officer of the executive branch, in violation of Article I, Section 1 of the U.S. Constitution and

the doctrine of Separation of Powers fundamental to our constitutional system, because it

delegates to the Executive Branch the legislative power to waive applicability of federal laws.

Further, Section 102(c), which allows the Secretary to waive, in her "sole discretion," those laws

she deems "necessary to ensure expeditious construction" of the border wall, lacks an intelligible

principle, in contravention of the Nondelegation Doctrine.

110.    The Secretary's Cameron County and Hidalgo County waivers made pursuant to

Section 102(c)(1) of IIRIRA are an unconstitutional exercise of legislative authority by an officer

of the executive branch, in violation of the lawmaking procedures set forth in the Presentment

Clauses expressed in Article I, Section 7, Clauses 2 and 3 of the U.S. Constitution, and in

violation of Article I, Section 1 of the U.S. Constitution and the doctrine of Separation of Powers

fundamental to our constitutional system.

## XI.    SIXTH CLAIM FOR RELIEF

### (Violation of the U.S. Constitution, Art. III,; amend. I, Right to Petition; amend. X; and amend. V, Due Process)

### (Judicial Power)

111.    Plaintiffs re-allege and incorporate by reference all the foregoing paragraphs as

though fully set forth herein.

112.    Section 102(c)(2)(A) of IIRIRA, as amended, restricts judicial review. The clause

reads in full:

(2) Federal court review. –

(A) In general. – The district courts of the United States shall have

exclusive jurisdiction to hear all causes or claims arising from any action

undertaken, or any decision made, by the Secretary of Homeland Security

pursuant to paragraph (1). A cause of action or claim may only be brought

alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

(B) Time for filing of complaint. – Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

(C) Ability to seek appellate review. – An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

113.    Section 102(c)(2)(A) of IIRIRA, as amended, seeks both to wrest concurrent jurisdiction from state courts by giving federal district courts "exclusive jurisdiction" over all claims, *and* to eliminate significant aspects of that "exclusive jurisdiction" by purporting to eliminate the federal district court's power to hear non-constitutional claims.

114.    Article III, Section 1 of the U.S. Constitution vests "[t]he judicial Power of the United States … in one supreme court."

115.    Article III, Section 2 of the U.S. Constitution provides: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."

116.    Section 102(c)(2)(A) of IIRIRA, as amended, is an unconstitutional, *ultra vires* legislative infringement of the judicial power expressed in Article III, Sections 1 and 2 of the U.S. Constitution and the doctrine of Separation of Powers fundamental to our constitutional system.

117.    By purporting to eliminate judicial review of non-constitutional claims, Section 102(c)(2)(A) of IIRIRA also violates the First Amendment's right to "petition the Government for a redress of grievances."

118.    Similarly, Section 102(c)(2)(A) of IIRIRA, as amended, violates the Tenth Amendment of the Constitution by purporting to remove the concurrent jurisdiction of the state courts over non-constitutional federal challenges but then failing to provide an adequate federal judicial forum for such claims.

119.    Section 102(c)(2)(A) of IIRIRA, as amended, also violates Fifth Amendment Due Process by attempting to deprive Plaintiffs and all other citizens of the United States from accessing *any* court to raise non-constitutional challenges to the Secretary's actions under Section 102. Adequate access to the Courts is a protectable right and interest under the Constitution; Section 102(c)(2)(A) of IIRIRA, as amended, purports to deprive Plaintiffs of that right; and the deprivation was without due process for all the reasons articulated herein.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Declare that the Department's attempt to waive all other laws in conjunction with border wall construction in the Cameron County and Hidalgo County waivers are unlawful *ultra vires* acts;

b.    Declare that the failure to consult with appropriate entities prior to issuing the waivers is an unlawful *ultra vires* act;

c.    Declare that the Secretary's failure to consult with appropriate entities to "minimize the impact on the environment, culture, commerce, and quality of life

for the communities and residents located near the sites at which such fencing is to be constructed," was arbitrary and capricious;

d.      Declare that the Waivers violate the Fifth Amendment of the U.S. Constitution;

e.      Declare that subparagraph (c)(1) of Section 102 of IRRIRA, as amended, is unconstitutional and void;

f.      Declare that subparagraph (c)(2)(A) of Section 102 of IIRIRA, as amended, is unconstitutional and void;

g.      Enjoin Defendants from constructing any border wall, fence, or other barrier, and any related road or infrastructure, in the vicinity of the United States and Mexico border in Hidalgo and Cameron Counties, unless and until Defendants come into compliance with all laws that would apply without the unlawful waivers;

h.      Award Plaintiffs their costs and reasonable attorney fees in this action; and,

i.      Grant such other and further relief as the Court may deem just and proper.



DATED: December 7, 2018

                                    Respectfully submitted,


                                    /s/ Zachary Fabish_____

                                    Zachary M. Fabish (DC# 986127)
                                    Senior Attorney
                                    Sierra Club
                                    50 F Street, NW - 8th Floor
                                    Washington, DC 20001
                                    (202) 675-7917
                                    (202) 547-6009 (fax)
                                    zachary.fabish@sierraclub.org

s/ Susan L. Williams

Susan L. Williams (DC#1006972)
Staff Attorney
Sierra Club
1536 Wynkoop St. Suite #200
Denver, CO 80202
Tel: (303) 454-3358
E-mail: laurie.williams@sierraclub.org

*Attorney for Plaintiff s*

## CERTIFICATE OF SERVICE

I, Susan L Williams, declare as follows:

I hereby certify that on this 7th day of December, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Executed on December 7, 2018.

/s/ Susan L Williams

Susan L Williams